[No. 25378-3-III. Division Three. June 19, 2008.]

JEFF KELLY ET AL., *Respondents*, v. CHELAN COUNTY, *Defendant*, ROBERT CULP, PE, ET AL., *Appellants*.

---

*Chancey C. Crowell*, for appellants.

*Brian E. Lawler* (of *Lawler, Burroughs & Baker, PC*), for respondents.

¶1 SCHULTHEIS, C.J. — A developer filed an application for a conditional use permit in 1989 but supplemented and revised its plans for the project on numerous occasions. In 2005, a hearing examiner found that the application vested to the regulations in effect in 1994 and approved the application. Neighbors who opposed the project won their appeal to the superior court under the Land Use Petition Act (LUPA), chapter 36.70C RCW. The developer now appeals. The neighbors have moved to dismiss the appeal because, with the passage of time, the permit expired due to the developer's failure to meet deadlines required by the permit. We agree with the neighbors and dismiss.

¶2 This appeal involves a multiple permit proposal for development on the shoreline of Lake Chelan on an uphill incline. The project site is bisected by a shoreward county road. A conditional use permit was necessary because the zoning resolution in effect required that within the general use district, " '[a]ll uses which are not listed as an outright permitted use in [former Chelan County Code] Section 11.36.010 [(1977)]' are a Conditional Use." Administrative Record (AR) Doc. 33, at 12 (quoting former Chelan County Code § 11.36.020 (1974)).

¶3 The permitting process began in 1989, when Robert Culp, PE, for Manson Engineers, Inc., submitted an application on behalf of Anton Roeckl, doing business as WICO (the developer), for a conditional use permit as part of its plan to develop property on the shoreline of Lake Chelan. This initial proposal was for a recreational beach area, erosion control, and to grade and riprap approximately 1,000 feet of lake frontage. The Chelan County Planning Department would not process the application for the shoreline request as a stand-alone project without the residential component referenced in the checklists required by the State Environmental Policy Act (SEPA), chapter 43.21C RCW.

¶4 In 1990, the developer revised the SEPA checklist, adding a 30-unit townhouse cluster, seawall, swimming pool, boat slips, beach house, realignment of the county road and a pedestrian underpass, along with the original beach and riprap.

¶5 In January 1991, 37 single family residential units and 8 townhouse units were added to the proposal and the proposed boat slips were changed to a 32-boat slip marina. The 37 single family residential units were also split off into a 90-lot plat.

¶6 In March 1991, the developer revised the proposal, adding 12 more townhouses, for a total of 50 townhouse units, and a grocery/hardware store. In June 1993, the developer increased the proposal to an 80-unit townhouse development with an 88-boat slip marina. The developer

submitted another application in April 1994. A June 1994 application provided for a 10-acre project.

¶7 On February 3, 1995, a SEPA mitigation agreement between the developer and the department was executed for a conditional use permit and shoreline substantial development permit for 80 townhouse units referred to as the "Missouri Harbor Townhouses." Included in the proposal were a small store, community beach facility, boat moorage for the future lot owners, seawall, a pedestrian underpass, and realignment of the county road to reduce reverse curves. The agreement was based on the application materials, site plan, and environmental checklist. Under the agreement, the developer agreed to amend its application through incorporation of the mitigation measures contained in the agreement and adhere to them. The department agreed to issue a mitigated determination of nonsignificance, which it did.

¶8 In 1998, the developer submitted another application eliminating the waterfront residential units, grocery/hardware store, realignment of the county road and pedestrian underpass, and 8 of the boat slips, leaving the marina with 80 slips and the townhouse units. The developer also introduced a bioengineered bank protection in lieu of a seawall.

¶9 On February 1, 2000, the Chelan County 2000 Comprehensive Plan (2000 comprehensive plan) was adopted, establishing a new comprehensive land use designation for the subject site. The new land use designation is rural waterfront. New zoning regulations implementing the comprehensive plan were adopted October 18, 2000.

¶10 As noted in a staff report dated February 18, 2002, the developer had not submitted an accurate site plan. According to the report, substantial changes made to the proposal after execution of the 1995 mitigation agreement required additional SEPA review. It was also noted that because the developer had altered the shoreline, the ordinary high water mark had not been determined, which complicated the examination of shoreline management com-

pliance. Additionally, the developer's shoreline development permit application and the conditional use permit associated with the project had been substantially amended from their submittal on November 6, 1998.

¶11 The report concluded that the application appeared "to be substantively incomplete" on February 18, 2002. AR Doc. 33, Ex. 1 (Feb. 18, 2002 Staff Report at 38). The report recommended review of the mitigation agreement and determination of nonsignificance to ascertain the effect the substantial changes had on the application and plans.

¶12 In March 2003, the developer submitted a plan to enhance the waterfront amenities by adding a separate floating breakwater and swim float, along with three sets of stairs through the bioengineered bank protection to accommodate a swimming area for condominium owners. This plan was rejected by the department as a substantial change to the original application. Another revised site plan was submitted in May 2003, eliminating those amenities. By 2005, the proposal included 2 single family waterfront units and 78 townhouse condominium units on an uphill slope to the west of the county road. As of July 2005, the developer's numerous planning iterations had resulted in 15 or more SEPA checklists and 4 SEPA determinations.

¶13 An amended mitigated determination of nonsignificance was issued on July 13, 2005. The determination covered an 80-unit condominium project and community pool and, divided by South Lakeshore Drive, 2 waterfront single family residences, a community dock with 80 boat slips, and substantial waterfront improvements. This document omitted one provision, revised one provision, and added several paragraphs.

¶14 In a decision dated August 19, 2005, a hearing examiner approved the conditional use, determining that the application was complete and vested to the regulations in effect in April 1994. The hearing examiner was persuaded by the developer's testimony at the public hearing that "the issuance of the initial environmental determination (MDNS [mitigated determination of nonsignificance],

4-27-94) was indicative of a 'complete' application." Clerk's Papers (CP) at 174 (Finding of Fact 38(a)). The hearing examiner concluded that "[a] Mitigated Determination of Non Significance can only be issued after an application is complete." CP at 181 (Conclusion of Law 10). The permit included a timeline and deadlines in which the developer was to meet the conditions in the permit and obtain other government approvals.

¶15 A number of property owners neighboring the site have vigorously opposed the project, including Jeff Kelly and David and Nancy Dorsey (neighbors). The neighbors filed a LUPA action in Chelan County Superior Court, appealing the land use decision by the hearing examiner. The superior court determined that the hearing examiner erred because the application did not vest prior to zoning changes on October 17, 2005. The developer appealed.

¶16 The neighbors have now moved to dismiss the appeal. They argue that, because the developer chose not to act on the permit and obtain the necessary government approvals within two years of the issuance of the conditional use permit, the permit has expired on its terms. *See, e.g., Snohomish County v. State*, 69 Wn. App. 655, 660, 850 P.2d 546 (1993) (dismissing appeal when the underlying permit to clear-cut timber had expired). We agree.

¶17 Here, the permit relevantly provides:

29. [Conditional use permit] approval and continuation:

a. Any approval of an application for a conditional use shall automatically be for a period of one year from the date of approval.

b. At the expiration of it's [sic] first year of approval, and after an administrative review by the Planning Office and certification by staff that all conditions of approval have been, or are being met, any such approved conditional use may be continued for one additional year.

c. At the expiration of it's [sic] second year of approval, and after a public hearing before the Chelan County Hearing Examiner at which it is found that the conditional use contin-

ues to meet all applicable conditions, any such conditional use may be granted permanent approval by the Hearing Examiner. All infrastructure installation and federal, state and local agency approvals shall be obtained prior to the 2 year deadline. **Failure to obtain <u>ALL</u> necessary approvals to proceed within 2 years of the Decision date will result in nullification of this conditional use permit.**

CP at 188.

¶18 With the exception of the last two sentences above, the relevant county ordinance then in effect reads the same.[1] Former CHELAN COUNTY CODE 11.56.045 (1969).

¶19 The neighbors assert that the developer has not complied with the timelines and deadlines provided in the permit. This claim is supported by the declaration of a county employee. The developer does not dispute its noncompliance. But it claims that the deadlines required by the permit are automatically tolled pending appeal.

¶20 The developer relies on *King v. King*, 2 Wn. App. 386, 468 P.2d 464 (1970). In *King,* the husband against whom a divorce action was filed appealed the superior court's decision on the disposition of the parties' assets and attorney fees. The husband did not appear for trial but was represented by counsel. The financial disposition ordered by the trial court involved two options, either one of which could be exercised by the husband, the first of which expired by its terms prior to the 30-day deadline for appeal of the court's decision. This first option was to be exercised by a date certain, which was within 18 days of the oral opinion or within 4 days of the entry of the written documentation. *Id.* at 387-88 & n.1.

¶21 This court held that the husband's appeal relieved him of any obligation under the trial court's decision until

---

[1] The ordinance has since been revised and recodified: "11.93.110 **Expiration.** A conditional use permit shall become void after three years after approval or such other time period as established by the hearing examiner if the use is not completely developed. Said extension shall not exceed a total of six years and said phases and timelines shall be clearly spelled out in the application." CHELAN COUNTY CODE 11.93.110.

the appeal was decided. The husband was permitted "30 days from the date of the remittitur" to take advantage of the first option. *Id.* at 390. In so deciding, the *King* court made the following statement relied upon by the developers in this case:

> An appeal suspends the time allowed in the judgment or order appealed from for the performance of a condition which affects a party's substantive right or obligation. As a result, the time for performance of the condition in the judgment or order begins after the appellate court's decision becomes effective. *Borrow v. El Dorado Lodge*, 75 Ariz. 218, 254 P.2d 1027 (1953); 4 Am. Jur. 2d *Appeal and Error* § 363 (1962); 28 A.L.R. 1029 (1924). This rule applies even though the time for performance of the condition expires prior to the expiration of the time for appeal and where the appeal is not taken until after the expiration of the time for performance of the condition. *Nakdimen v. Brazil*, 137 Ark. 188, 208 S.W. 431 (1919).

*Id.* at 388-89.

¶22 In *King,* however, the husband was the initial appellant. The authority relied on by *King* also involves the obligations of appellants. *See also Borrow*, 75 Ariz. at 220 ("appellants will have thirty days from issuance of the mandate herein in which to comply with the order of remitter of the trial court, or submit to a new trial"). Here, it was the hearing examiner who made the initial decision, including the imposition of deadlines. But the developer did not appeal the deadlines and it made no effort to obtain the required approvals or otherwise act on the permit while defending the appeal at the superior court. The neighbors did not attempt to prevent the developer from acting on the permit. Similarly, in *Nakdimen*, the court examined the timelines set forth in the underlying order for a determination of whether time was of the essence in the order. *Nakdimen*, 208 S.W. at 433.

¶23 In this case, the underlying action involved a land use that was not permissible under current standards. The deadlines were undoubtedly meant to motivate action from the developer to avoid any further delay on the construction

of a project that started almost 20 years ago. Time is of the essence here. *See* RCW 36.70C.010 (stating that the purpose of the LUPA is to provide an expedited process for land use actions).

¶24 In every case involving the vested rights doctrine, it is recognized that development interests protected by the doctrine come at a cost to the public interest because the practical effect of recognizing a vested right is to sanction the creation of a new nonconforming use. *Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 280, 943 P.2d 1378 (1997) (citing *Erickson & Assocs., Inc. v. McLerran*, 123 Wn.2d 864, 873-74, 872 P.2d 1090 (1994)). In light of these competing interests, the time allowed for the implementation of the right sought to be vested is reasonably limited. With the passage of time, it is likely to see a greater impact to the public interest in permitting the outmoded use. This perception is reflected in the wording of the permit, which emphasizes the importance of obtaining the necessary government approvals and provides for "nullification" of the conditional use permit in the event of a failure to obtain the required government approvals within two years. CP at 188. "Nullification" is a state of invalidity as opposed to mere expiration, which implies the opportunity for renewal. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1549 (1993).

¶25 Further, the deadlines were conditions under which the permit was granted. Those deadlines were a decision of the hearing examiner, which is subject to review only under the LUPA. RCW 36.70C.030(1) (LUPA is "the exclusive means of judicial review of land use decisions"). The developer's current challenge to the deadlines may then constitute a collateral attack of the permit. *See James v. Kitsap County*, 154 Wn.2d 574, 586, 115 P.3d 286 (2005) (holding that the imposition of impact fees as a condition on a building permit was unreviewable absent a timely challenge to the permit); *see also Cobbossee Dev. Group v. Town of Winthrop*, 585 A.2d 190, 193 (Me. 1991) (rejecting the developer's argument that the conditions provided for in the conditional use permit extended the one-year deadline for commencement of construction).

¶26 The rules applicable to a stay of a LUPA action pending appeal are governed by RCW 36.70C.100.[2] It provides, "A petitioner or other party may request the court to stay or suspend an action by the local jurisdiction or another party to implement the decision under review." RCW 36.70C.100(1). Because this statute affords any party an opportunity to obtain a stay, the developer's argument—that a stay is automatically afforded it—is illogical. The neighbors' argument also finds support in a decision from another jurisdiction.

¶27 In *Gold v. Kamin*, 170 Ill. App. 3d 312, 524 N.E.2d 625, 120 Ill. Dec. 595 (1988), a zoning board granted a developer a variance. Persons opposed to the variance appealed to the circuit court, which affirmed the zoning board's decision. The appellate court, however, dismissed the appeal as moot because the 18-month time period in which the developer was to obtain a building permit had lapsed and no stay had been requested. In so deciding, the Illinois court noted that a trial court, upon appeal of a land use decision made by an administrative agency, had statutory authority to stay the decision pending review if requested by either the developer or the objectors. *Id.* at 314-15. The developer also had an opportunity to stay the action through the appellate rules, in either the trial court or in the appellate court, which it declined to do.

¶28 Because of Illinois's statutory provision and rules allowing a stay, the court in *Gold* rejected the reasoning of two other out-of-state cases where neither jurisdiction's legislature provided a stay and the courts held that the pendency of an appeal tolls the expiration date of the variance granted. *Id.* at 314 (citing *Belfer v. Bldg. Comm'r*,

---

[2] Because LUPA provides for a stay, the supersedeas procedure in RAP 8.1 is applicable. *See* RAP 8.1(b)(2) ("*Except where prohibited by statute*, a party may obtain a stay of enforcement of a decision affecting rights to possession, ownership or use of real property, or of tangible personal property, or of intangible personal property, by filing in the trial court a supersedeas bond or cash, or by alternate security approved by the trial court pursuant to subsection (b)(4)." (emphasis added)); RCW 36.70C.030(1) (providing that LUPA is "the exclusive means of judicial review of land use decisions").

363 Mass. 439, 294 N.E.2d 857 (1973) (failure to give relief from the time limitations for construction imposed by the terms of the variance could result in frustration of a lawfully awarded variance by the delay inherent in an appeal); *Tantimonaco v. Zoning Bd. of Review*, 102 R.I. 594, 232 A.2d 385 (1967) (holding that common prudence dictates that the party granted the time-limited variance should not incur obligations, the benefit of which would be cancelled by an adverse decision on appeal)).

¶29 We find the reasoning in *Gold* to be sound: in the face of a statute that authorizes the granting of a stay, the party against whom time has expired under the original grant cannot avail himself of an "automatic stay" under the common law.

¶30 The developer asserts that there was no decision to stay. The plain language of the statute, however, provides that the developer "may request the court to stay or *suspend an action by the local jurisdiction . . . to implement the decision under review.*" RCW 36.70C.100(1) (emphasis added). The permit called for nullification for failure to adhere to certain deadlines. The developer should have sought to stay the effective date of the deadlines.

¶31 The developer claims that it was not required to seek a stay under RCW 36.70C.100(1). It relies on *Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Associates*, 151 Wn.2d 279, 287-88, 87 P.3d 1176 (2004). In *Pinecrest*, the developer contended that the neighbors' appeal was rendered moot by their failure to obtain a stay under RCW 36.70C.100(1). The Supreme Court noted the permissive language in the statute—that the party *may* request a stay—and held that the neighbors were not required to seek a stay to preserve their appeal, but such a failure allowed the developer to act on the favorable decision of the superior court.

¶32 *Pinecrest* has little relevance here. The developer in *Pinecrest* argued that a building permit was issued and construction had begun, thus the neighbors' appeal was moot because the construction of the project was what the

neighbors sought to prevent and it did not seek a supersedeas bond or injunction to prevent construction from proceeding. *Pinecrest Homeowners Ass'n v. Glen A. Cloninger & Assocs.*, 115 Wn. App. 611, 619, 62 P.3d 938 (2003), *rev'd,* 151 Wn.2d 279 (2004). Here, the developer is not merely seeking to preserve its appeal. Instead, it is asking that it be relieved of *certain conditions* of the grant of the conditional use permit, which it did not appeal or attempt to stay.

¶33 The relevant ordinance, which is also set forth in the permit, sets forth a timeline to which the developer has not complied. The developer does not explain why it should be relieved of these requirements, which have the effect of a statute of limitations. *See Douglass v. City of Spokane*, 25 Wn. App. 823, 824-25, 609 P.2d 979 (1980) (referring to time limits in an ordinance as a "statute of limitation"); *see also Ward v. Bd. of Skagit County Comm'rs*, 86 Wn. App. 266, 273-74, 936 P.2d 42 (1997) (holding that the 14-day appeal period in a local ordinance was not preempted by LUPA's 21-day deadline for judicial review); *Somers v. Snohomish County*, 105 Wn. App. 937, 949-50, 21 P.3d 1165 (2001) (denying as premature a stay where the appeal was decided well within the five-year statutory deadline to record a final plat after preliminary plat approval).

¶34 The developer's appeal is therefore dismissed.

SWEENEY, J., and THOMPSON, J. PRO TEM., concur.

Review granted at 165 Wn.2d 1019 (2009).